**John Rue, Esq.**
**Attorney ID No. -#47032005**
**RUE LAW GROUP**[1]
**100 Overlook Center**
**2nd Floor, #9211**
**Princeton, NJ 08540**
**(862) 283-3155**
**Attorneys for Plaintiff**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| C.P., individually and on behalf of F.P., a minor child,<br>Plaintiff,<br>v.<br>New Jersey Department of Education; Kevin Dehmer, Commissioner of Education, in her official capacity; the Office of Administrative Law, and Clifton Board of Education,<br>Defendants. | Civil Action No. 1:21-15677-ESK-MJS<br><br>**SECOND AMENDED COMPLAINT**<br><br>**[PROPOSED]**<br><br>**JURY TRIAL DEMANDED**[2] |

[1] Rue Law Group is a DBA owned by John Rue & Associates, LLC
[2] Plaintiff asserts this jury demand pursuant to Fed. R. Civ. P. 38(b), which renews the right upon amendment raising new issues of fact."

## INTRODUCTION

Plaintiff Cecelia Paredes, o/b/o F.P hereby alleges this Second Amended Complaint against Defendants New Jersey Department of Education ("NJDOE"), Kevin Dehmer, Commissioner of Education ("Commissioner Dehmer"), in her official capacity,[3] the Office of Administrative Law ("NJOAL"), and Clifton Board of Education ("Clifton" or the "District") states as follows:

## NATURE OF THE ACTION

1. This action arises out of the failure of defendant NJ-DOE to comply with its statutory obligation to process a due process hearing request within the timelines imposed by federal statute and regulations, NJOAL's failure to meet its obligations to NJDOE negotiated for the benefit of C.P., and Clifton Board of Education's collusion with the OAL to undermine the civil rights of C.P. to a fair due process hearing.

2. Plaintiff's claims against NJ-DOE and Commissioner Dehmer are focused on violations of the time limit established by 34 C.F.R. §300.515 and *N.J.A.C.* 6A:14-2.7(j) for completing due process hearings.

3. The primary focus of this amendment is (a) to add damages claims, assert a clear cause of action for collusion between Clifton and NJOAL, and (c) to add

[3] Because Commissioner Dehmer is joined in her official capacity, in the event that the is replaced as Commissioner of Education, all references herein to her should be deemed to be directed to her successor, if any.

the Office of the Administrative Law as a co-defendant for the damages claims.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 because it arises under the Constitution and laws of the United States, including the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415(i)(3)(A), and 42 U.S.C. §1983.

5. This Court has authority to grant declaratory and injunctive relief, if warranted, pursuant to 28 U.S.C. §§2201 and 2202.

6. This Court has supplemental jurisdiction, under 28 U.S.C. §1367, to adjudicate any state-law claims that form part of the same case or controversy as the federal claims asserted herein.

7. Personal jurisdiction exists over all defendants because they reside in, are organized under the laws of, or conduct substantial business within the State of New Jersey, and the acts and omissions giving rise to this action occurred within this State.

8. Venue is proper in this District under 28 U.S.C. §1391 because all defendants reside in this District and because a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

9. Plaintiff Cecelia Paredes ("C.P.") is the mother of F.P., a student with disabilities entitled to protections under the Individuals with Disabilities Education Act ("IDEA"). She is a court appointed class representative in *C.P. I* and a member of the putative class in *J.A. v. N.J. Department of Education*.

10. Defendant NJ-DOE is a State Educational Agency ("SEA") as that term is defined in 20 U.S.C. §1401(32); 34 C.F.R. 300.41; and a "public entity" as that term is defined in 42 U.S.C. §12131(1); 28 C.F.R. 35.104; and otherwise receives federal funds for special education under various federal statutes and, as such, is responsible for establishing and maintaining a system for resolution of disputes and ensuring compliance with all mandates arising under the numerous federal statutes for providing special education through its Office of Special Education Programs ("OSEP").[4]

11. NJ-DOE has its principal place of business located at 100 River View Plaza, Trenton, Mercer County, New Jersey 08625-0500.

---

[4] OSEP has re-branded itself more than once recently, first renaming itself the "Office of Special Education Policies and Procedures" ("OSEPP"), and more recently the Office of Special Education Dispute Resolution ("SPED-R"). But even the NJ-DOE's own website has not kept up with these name changes. The New Jersey Administrative Code still refers to the subpart of the NJ-DOE responsible for special education as the Office of Special Education Programs. *See*, *e.g.*, N.J.A.C. 6A:14-2.6(d) ("Mediation is available from the Department of Education at the State level through the **Office of Special Education Programs**." (emphasis added)). Accordingly, this Complaint uses the same nomenclature for the office, and abbreviates its name as OSEP.

12. Commissioner Kevin Dehmer, named herein in her official capacity, is the state officer in charge of the NJ-DOE.

13. Clifton Board of Education is a body corporate of the State of New Jersey and is charged by the State of New Jersey with the conduct, supervision, and management of public schools for Clifton, and is the "local educational agency" that provide special education services to F.P.

14. New Jersey Office Administrative Law (the "OAL") is the New Jersey Agency which NJDOE delegates authority to convene due process hearings under the IDEA.

15. Defendant Robert Thurston is an attorney licensed to practice law in the State of New Jersey. He is the principal of Thurston Law Offices and has appeared in matters involving special education litigation in New Jersey, including proceedings overlapping with C.P. v. New Jersey Department of Education and J.A. v. New Jersey Department of Education.

16. At all relevant times, Thurston held himself out as acting on behalf of parents of children with disabilities, including in a representative or putative representative capacity affecting the rights of absent class members. Through that role, he obtained access to confidential information, litigation strategy, and settlement leverage derived from class-based claims and proceedings.

17. Defendant Thurston Law Offices ("TLO") is a law firm organized under the laws of the State of New Jersey, with its principal place of business in New Jersey. At all relevant times, TLO acted by and through its principal, Robert Thurston, and is vicariously liable for her acts and omissions.

18. At all relevant times, Thurston and TLO participated in litigation and settlement negotiations involving claims that overlapped with the C.P. class action and the putative class in J.A., and in doing so, exercised influence over the disposition of claims affecting absent class members. Through these activities, Thurston and TLO occupied positions of trust and confidence with respect to those class members and owed fiduciary duties arising from that role.

## DUE PROCESS AND FEE-SHIFTING RIGHTS UNDER THE IDEA

19. The IDEA guarantees parents an impartial due process hearing whenever they dispute the identification, evaluation, placement, or provision of a free appropriate public education ("FAPE") for their child. 20 U.S.C. § 1415(f)(1)(A); 34 C.F.R. § 300.511(a). The hearing must be conducted by a qualified and impartial hearing officer and must result in a written decision based solely on the evidence presented. 34 C.F.R. § 300.511(c)–(d).

20. The right to due process includes the right to obtain a decision based on the merits of the dispute rather than on coercive or extrajudicial considerations.

21. Children with disabilities not only have legal rights under IDEA, but also parents have legal rights of their own that are enforceable. *Winkelman v. Parma City School Dist.*, 550 U.S. 516, 524 (2007). The most important parental right under IDEA is the right to fully and meaningfully participate in the education planning of a child. *Id.* This right goes back at least a hundred years, when it was first recognized by the Supreme Court of the United States. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) (recognizing as a constitutional right, the "liberty of parents and guardians to direct the upbringing and education of children under their control.").

22. The IDEA guarantees children with disabilities and their parents numerous additional and more specific legal rights, identified as "Procedural Safeguards." *See generally* 20 U.S.C. §1415; 34 C.F.R. 300.500-520; *N.J.*A.C. 6A:14.2 *et seq*.

23. Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies. Among the rights protected by the procedural safeguards are below:

A. The right to an independent educational evaluation ("IEE") "ensures parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion. They are not left to challenge the government . . . without an expert with the firepower to match the opposition." 546 U.S. at 60-61.

B. "IDEA . . .requires state authorities to organize hearings in a way that guarantees parents and children the procedural protections of the Act." *Id.* at 61 (citing 20 U.S.C. §1415(a)).

C. "Finally, and perhaps most importantly, parents may recover reasonable attorneys' fees if they prevail." *Id.* (citing 20 U.S.C. § 1415(i)(3)(B)).

24. "The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue." *Endrew F.,* 137 S. Ct. at 1001 (emphasis supplied).

25. A procedural violation amounts to a denial of FAPE if the violation impeded the child's right to an appropriate education or caused a deprivation of educational benefit. 20 U.S.C. §1415(f)(3)(E)(ii)(I), (III).

26. Importantly for this case, a procedural violation also amounts to a substantive denial of FAPE when it "significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a [FAPE] to the parents' child." 20 U.S.C. §1415(f)(3)(E)(ii)(II); *D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x 564, 567 (3d Cir. 2012) (where school district's predetermination of placement denied meaningful parental

participation, there was a denial of FAPE, and district court need not consider merits of proposed IEP).

27. States are eligible to receive federal funding for special education only "if the State submits a plan that provides assurances to the U.S. Secretary of Education that the State has in effect policies and procedures to ensure that . . . Children with disabilities and their parents are afforded the procedural safeguards required by section 1415 of this title" among other rights on an equal footing with school districts, which are publicly funded and routinely represented by counsel.

28. NJ-DOE receives federal funds pursuant to IDEA, 20 U.S.C. §1412 and therefore must comply with the statute's provisions. *Endrew F.*, 137 S. Ct. at 993. Accordingly, NJ-DOE must submit an annual State Performance Plan and Annual Performance Report ("SPP/APR") to the United States Secretary of Education ensuring that it has procedural safeguards in place for children with disabilities in the State of New Jersey.

29. Congress, moreover, has abrogated state sovereign immunity "from suit in Federal court for a violation of [IDEA]." 20 U.S.C. §1403(a). Thus, "[i]n a suit against a State for a violation of [IDEA], remedies (including remedies both at law and in equity) are available for such a violation to the same extent

as those remedies are available for such a violation in the suit against any public entity other than a State." 20 U.S.C. §1403(b).

30. One of IDEA's key procedural safeguards is "[a]n opportunity for any party to present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. §1415(b)(6).

31. From the date of filing a complaint, the local educational agency ("LEA") has thirty (30) days within which to settle or otherwise resolve the dispute. 20 U.S.C. §1415(f)(1)(B)(ii); 34 C.F.R. 300.510(a)(1).

32. IDEA defines "day" to mean a calendar day. 34 C.F.R. 300.11(a).

33. If a dispute is not resolved to the satisfaction of the parents within the 30-day "resolution period," it may proceed to a due process hearing. 20 U.S.C. §1415(f)(1)(B)(ii) ("If the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all of the applicable timelines for a due process hearing under this subchapter shall commence"); 34 C.F.R. 300.510(b)(1).

**The 45-Day Rule**

34. As directly relevant to the instant action, the law requires a final decision to be rendered in the due process case within 45 days after the end of the 30-day

resolution period. 34 C.F.R. 300.515(a) ("The public agency must ensure that not later than 45 days after the expiration of the 30 day period . . . [a] final decision is reached in the hearing." (emphasis added)). This requirement is modified, however, by 34 C.F.R. 300.515(c), which states that "[a] hearing or reviewing officer may grant **specific extensions of time** beyond the periods set out in paragraphs (a) and (b) of this section **at the request of either party**." 34 C.F.R. 300.515(c) (emphases added). This is commonly referred to as the "45 Day Rule."

35. New Jersey implements the federal 45 Day Rule by state regulation, which closely tracks the federal regulation:

> A final decision shall be rendered by the administrative law judge not later than 45 calendar days after the conclusion of the resolution period . . . unless **specific adjournments** are granted by the administrative law judge in response to **requests by either party** to the dispute.

N.J.A.C. 6A:14-2.7(j) (emphases added).

36. Fee-shifting serves a structural function within the IDEA's due-process scheme. It preserves the integrity of the hearing system by removing economic disincentives to seek impartial review. When parents are forced to waive their right to attorneys' fees as a condition of receiving educational relief, the balance Congress created is destroyed and due process itself is denied.

37. A waiver of attorneys' fees extracted through coercion or as a condition of settlement is inconsistent with the IDEA and with the Fourteenth Amendment's guarantee of due process. Such practices nullify Congress's intent to make IDEA enforcement financially feasible for parents, distort the hearing process in favor of school districts, and cause measurable economic loss to parents and their attorneys.

38. The New Jersey Department of Education ("NJDOE") and the Office of Administrative Law ("OAL"), acting under color of state law and as recipients of federal IDEA funds, are required to administer due-process hearings in conformity with these safeguards. Their failure to do so—and their acquiescence in fee-waiver conditions imposed by local districts—constitute a violation of federal statute and of parents' constitutional right to due process.

39. As a direct and proximate result of these practices, C.P. has suffered compensable damages, including the loss of recoverable attorneys' fees, out-of-pocket legal expenses, and consequential educational harm to her child. These claims arise from the same core administrative conduct that affected Plaintiff's due process proceeding.

40. Plaintiff asserts her individual rights arising from the conduct described herein and does not waive any claims available to her under federal or state law.

**SECTION 1983**

42 U.S.C. 1983 ("Section 1983")

41. Section 1983 authorizes suit against state or local officials for the deprivation of any rights, privileges, or immunities secured by the Constitution and federal laws.

42. The Fourteenth Amendment prohibits any State from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1.

43. Procedural due process requires that the State afford affected individuals "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); see also *B.S. v. Somerset Cnty.*, 704 F.3d 250, 271 (3d Cir. 2013).

44. By coercing parents to waive their statutory right to attorneys' fees as a condition of obtaining educational relief for their children, the State defendants acted under color of state law to deprive parents of a protected property interest. The right to recover reasonable attorneys' fees under 20 U.S.C. § 1415(i)(3)(B) constitutes a financial entitlement created by federal statute. The knowing elimination of that entitlement without a fair hearing violates the Due Process Clause.

45. These coercive practices were not isolated or accidental. They were implemented and ratified by senior officials within the New Jersey Department of Education and the Office of Administrative Law, who maintained procedures that forced parents to choose between their child's immediate educational needs and their right to be made whole for legal costs already incurred.

46. As a direct and proximate result of these practices, Plaintiff suffered measurable damages, including (a) the loss of recoverable attorneys' fees, and (b) out-of-pocket expenditures for legal representation that should have been reimbursed.

47. The State's conduct also caused non-economic harm, arising from the deprivation of procedural due process and coercive fee-waiver pressure, and the frustration of fundamental parental rights recognized by the Supreme Court in *Pierce v. Soc'y of the Sisters*, 268 U.S. 510 (1925), and *Winkelman v. Parma City Sch.* (2007).

48. Plaintiff seeks all damages available under Section 1983, including compensatory damages, and consequential damages for economic losses against responsible officials in their individual capacities, as well as attorneys' fees and costs under 42 U.S.C. § 1988.

## FACTUAL ALLEGATIONS

49. In New Jersey, parents who dispute a district's proposed special education program or placement must file a written request for a due process hearing ("Due Process Petition") with the New Jersey Department of Education's Office of Special Education Programs ("OSEP"). N.J.A.C. 6A:14-2.7(c).

50. The petition must identify the student, state the issues in dispute, and specify the relief sought. Id. Upon receipt, OSEP must process the request and make available both mediation and a due process hearing in accordance with law. N.J.A.C. 6A:14-2.7(g).

51. Parents may also begin the process by requesting mediation under N.J.A.C. 6A:14-2.6. If mediation fails, the matter converts to a due process petition, triggering a thirty-day "resolution period" during which the local educational agency ("LEA") may attempt to settle. N.J.A.C. 6A:14-2.6(d)(3), -2.7(h).

52. If the dispute is not resolved within thirty days, the NJDOE must transmit the case to the Office of Administrative Law ("OAL") for adjudication before an impartial administrative law judge. N.J.A.C. 6A:14-2.7(h)(4).

53. At every stage, the IDEA guarantees that parents are entitled to due process of law and to the recovery of reasonable attorneys' fees if they prevail. 20 U.S.C. § 1415(i)(3)(B). New Jersey is required, as a condition of federal

funding, to administer this dispute-resolution system in a manner that preserves those statutory rights.

54. In practice, however, the NJDOE and OAL have administered the process in a manner that deprives parents of those rights, and particularly the right to fee shifting.

55. Districts are permitted—and often encouraged—to condition any settlement on a waiver of attorneys' fees, even where the parents have already prevailed on the merits. This practice denies due process, chills meritorious claims, and causes direct, measurable financial injury to parents and their counsel, who are deprived of compensation guaranteed by federal law. *See Pinto v. Spectrum Chems*, 200 N.J. 580 (N.J. 2010).

56. The enforcement of such fee-waiver conditions in Plaintiff's proceeding violated 20 U.S.C. § 1415 and the Fourteenth Amendment and caused direct economic harm to Plaintiff.

**<u>C.P.'s Request for IEEs</u>**

57. Paredes's son, F.P., was born in 2006 and at all times relevant has been a resident of Clifton, New Jersey.

58. F.P. was a student classified as Other Health Impaired ("OHI") and entitled to receive special education programs and services under the IDEA.

59. In November 2016, Clifton conducted a triennial reevaluation that included a psychological assessment performed by school psychologist Marianette Bonet on or about November 21, 2016.

60. By letter dated January 18, 2017, Plaintiff C.P. advised Clifton that she disagreed with the results of Ms. Bonet's evaluation and requested an independent psychological evaluation ("IEE") at public expense. She also requested an independent auditory processing evaluation, as required by 34 C.F.R. §300.502(b).

61. Clifton did not respond to C.P.'s January 18, 2017 request.

62. By letter dated March 23, 2017, C.P. again wrote to Renee Blackowski, the district's Coordinating Supervisor of Special Services, reiterating her request for the two independent evaluations.

63. Clifton again failed to respond. It did not provide C.P. with required information about how to obtain an IEE, nor did it file for due process within twenty days to contest the request.

64. In fact, Clifton never initiated due process to obtain a court order that would excuse its obligation to provide the IEE.

**C.P.'s Petition for Due Process**

65. Clifton's failure to act deprived F.P. of timely evaluations necessary to develop an appropriate IEP and forced C.P. to retain counsel at her own expense to compel compliance.

66. As a direct result of Clifton's inaction, C.P. incurred legal fees, expert costs, and delay-related educational harm to her child—injuries that would have been fully compensable under the IDEA's fee-shifting provision had the State's dispute-resolution system functioned as intended.

67. Instead, when C.P. sought to resolve the matter through mediation and settlement, she was pressured to waive her right to attorneys' fees as a condition of receiving any substantive relief.

68. The NJDOE and OAL, acting through their agents and procedures, permitted and enforced this coercive condition. By doing so, they deprived C.P. of due process, forced her to absorb unreimbursed legal costs, and stripped her of a statutory property interest expressly guaranteed by federal law.

69. The economic loss associated with that coerced waiver—including the value of legal services provided, and expert costs—constitutes compensable damage under 42 U.S.C. §1983 and the IDEA.

## C.P.'S PETITION FOR DUE PROCESS

70. On April 27, 2017, C.P. filed a petition for due process, on her own behalf and on behalf of F.P., with the NJ-DOE. The petition sought an order holding her LEA liable for the cost of an independent education evaluation of F.P.

71. On October 24, 2017, NJ-DOE transmitted the matter to the OAL as a contested matter.[5]

72. NJDOE was not a formal party to the administrative proceeding, but retained supervisory authority.

73. On December 8, 2017, the mandated 45-day period to adjudicate a contested matter (alternatively "for an ALJ to reach a final decision in a hearing and mail a copy of that decision to each party") expired.

74. The matter did not conclude on December 8, 2017. Rather, the following ensued:

A. On December 11, 2017, the Board filed a Motion to Dismiss.

B. By letter dated December 12, 2017, counsel for C.P. asked the ALJ to administratively terminate the Board's motion and to set dates for briefing of cross-motions for summary disposition.

C. On December 12, 2017, the parties advised the settlement judge that the matter had not settled, and the matter was assigned to ALJ Celentano.

---

5 Transmittal of the due process petition was delayed at the request of both parties to allow additional time to negotiate a settlement. These efforts were unsuccessful. The time related to this delay has not been counted in the allegations below.

D. On December 12, 2017, the OAL issued a Notice of Filing and Hearing scheduling a telephone hearing on December 22, 2017.

E. On December 22, 2017, C.P. wrote to the court indicating she was still willing to settle.

F. On or about December 26, 2017, the Board agreed to a settlement to reimburse C.P. for evaluations.

G. On January 2, 2018, counsel for District requested a one week extension for the parties to file their motions for summary disposition.

H. On or about January 8, 2018, the Board withdrew its December 26, 2017 offer.

I. Each party filed a Motion for Summary Decision with ALJ Celentano on January 12, 2018.

J. The motions were fully briefed by February 2, 2018.

K. Pursuant to the OAL hearing rules, motions for summary decision "shall be decided within 45 days from the due date of the last permitted responsive filing" N.J.A.C. 1:1-12.5(c).

L. ALJ Celentano did not decide the summary decision motions within 45 days.

M. During a telephone status conference held on April 9, 2018, ALJ Celentano stated to counsel to both parties that she would not decide the pending motions and that either the case would settle, or it would go to trial.

N. On April 9, 2018, the OAL set the hearing in this matter for September 7, 2018.

O. By letter dated July 13, 2018, Petitioners urged the Court to resolve the pending cross-motions which had been pending for one hundred and sixty-one (161) days.

P. Subsequent to ALJ Celentano's refusal to decide the summary decision motions, the parties came to another agreement subject to approval at the next Board of Education meeting scheduled for August 22, 2018.

Q. On August 17, 2018, C.P.'s counsel provided the Board's counsel with an executed signature page of the settlement agreement.

R. Board counsel acknowledged receipt and did not object to the provision of only a signature page.

S. Board counsel did not communicate with C.P.'s counsel again until nine (9) days after the Board meeting. At that time, Clifton objected for the first time to the receipt of only a signature page.

T. By letter dated September 5, 2018, Clifton requested a conference call with the court to discuss adjourning the hearing date.

U. On September 6, 2018, the parties participated in a conference call with the court.

V. On September 6, 2018, the OAL issued a Notice of Filing and Hearing scheduling a hearing on October 24, 2018.

W. On October 11, 2018, C.P. filed a cross motion for sanctions.

X. On October 24, 2018, the parties appeared for the only day of hearing.

Y. The parties submitted post-hearing briefs on November 19, 2018.

75. A self-styled "final" decision was issued pursuant to the hearing on December 13, 2018 by Administrative Law Judge Leslie Z. Celentano. A true copy of the December 13, 2018 Final Decision is attached hereto as Exhibit A.

76. The written opinion demonstrated a failure to apply governing IDEA standards and controlling legal principles.

77. The opinion left entirely unaddressed **five** pending motions brought by C.P.

A. C.P. moved for summary disposition, which was fully briefed on February 22, 2018, on the ground that the district had failed never to respond to her request for an independent evaluation. **The motion was never decided**. In fact, the ALJ stated on a call with

counsel that she would **never** decide the motion, stating that either the case would settle or she would convene a hearing.

B. Concurrently with the above summary decision motion, C.P. filed a sanctions motion against the District's counsel for a frivolous filing. **The motion was never decided.**

C. On September 4, 2018 (three days before the scheduled hearing), C.P. moved to exclude all of the District's evidence, for failure to comply with the 5-day disclosure rule. **The motion was never decided.** Rather, the ALJ adjourned the hearing (over CP's objection) for the sole purpose of permitting the District to cure an incurable failure to disclose.

D. Related to the motion to exclude, on the same date, C.P. again moved for summary decision, because the District bore the burden of proof. **The motion was never decided.**

E. On October 11, 2018, C.P. moved on for sanctions against the District's counsel, for egregiously improper discovery misconduct (i.e., the subpoena of a third party witness (F.P.'s clinicians, whose information is protected by HIPPA) with a modified subpoena form (suggesting that failure to comply with the improper subpoena could lead to judicial sanctions, which the OAL is without power to impose), and without notice to C.P.'s counsel). **The motion was never decided**.

78. Additionally, the "final" decision never resolved the simple question of the district's liability. The district's counsel conceded liability on the record. But ALJ Celentano ignored this concession, and ruled for the District on the basis that documentation of the costs incurred to obtain the evaluations privately were insufficient. The decision ignored the fact that, if the District were liable for the evaluation, even if the documentation were insufficient, C.P. would be

entitled to obtain new evaluations that corrected any deficiencies the ALJ identified.

79. At a minimum, the above errors demonstrate a failure to comply with IDEA standards and procedural safeguards governing impartial adjudication.

80. On information and belief, the actions described above were taken with improper motive following Plaintiff's efforts to obtain mandamus relief.

81. Because either of the above would be ethics violations under the rules applicable to ALJs at the OAL, C.P.'s counsel (in due course, after careful consideration) filed a complaint against ALJ Celentano.[6] The Complaint was sent, on August 6, 2019, to Governor Murphy, with copies to NJ-DOE and the then-Acting Chief Judge of the Office of Administrative Law. **No response was ever received**.

82. Hearing nothing back about the complaint for several months, on October 22, 2019, C.P.'s counsel contacted the office of the Chief Judge to inquire about its status. On November 4, 2019, Candice Hendricks (of the OAL) sent a response stating that the Complaint had been received, but would not be considered until the federal appeal of the decision was resolved. The letter

---

[6] This was the first and only time that the undersigned has ever filed a complaint against a judge in any forum.

stated that "upon receiving notice that a decision by the District Court has issued, we will proceed with the investigation you requested."

83. On June 22, 2021, C.P.'s counsel commenced the remand proceedings, after issuance of an order from this Court, putting NJ-DOE and the OAL on notice that the district court had decided the case. Neither C.P. nor her counsel has received any indication that the Complaint is or will be investigated.

84. During the initial pendency of the case, after **deducting** the days related to specific adjournments requested by either party or by consent, **three hundred nine (309) days elapsed** from the date the matter was transmitted to the OAL to the date a final decision was issued.

85. The "final" decision did not even address, let alone resolve, the sole claim asserted in C.P.'s petition for due process. Moreover, the ALJ left six (6) motions, the majority of which were dispositive, entirely unresolved and unaddressed, both in the "final" decision and otherwise.

86. C.P. filed an appeal on March 13, 2019. *See C.P. o/b/o F.P. v. Clifton Bd. of Edu.*, Civ. Action No. 19-8469 (JLL)(LAD).

87. On August 6, 2020, that appeal was resolved by a remand. A true copy of this Court's Opinion remanding this matter to the OAL is attached hereto as Exhibit B.

88. Following remand from federal court, C.P.'s administrative matter was recommenced in the Office of Administrative Law ("OAL") on June 22, 2021.

89. Under federal and state regulations, the OAL was required to issue a final decision within forty-five (45) days of that date. See 34 C.F.R. §300.515(a); N.J.A.C. 6A:14-2.7(j). The forty-five-day period therefore expired on August 8, 2021.

90. The OAL did not comply with this mandate. Instead, the matter remained pending for nearly four months and was resolved only after 118 days—without ever holding a hearing.

91. During that period, the following events occurred:

A. On July 12, 2021, the OAL conducted an initial prehearing conference.

B. At the OAL's direction, on August 12, 2021, the parties submitted a joint stipulation of facts.

C. At the OAL's direction, on September 27, 2021, the parties filed cross-motions for summary decision.

D. The motions were fully briefed by October 7, 2021.

92. On October 18, 2021, the OAL issued a second self-styled "Final Decision" (the "Remand Decision"), a true copy of which is attached as Exhibit C.

93. The New Jersey Department of Education failed to ensure that the remanded matter was adjudicated within the statutory timeframe or in compliance with IDEA procedural safeguards.

94. Instead, the remanded matter took one-hundred eighteen days to complete, and did not even include a hearing.

95. The Office of Administrative Law failed to prevent Clifton from conditioning merits settlement on a waiver of attorneys' fees.

96. The extended delay, absence of a hearing, and issuance of a truncated "Final Decision" deprived C.P. and her child of the opportunity to be heard at a meaningful time and in a meaningful manner, in violation of the Fourteenth Amendment and 20 U.S.C. §1415(f).

97. The Remand Decision also failed to resolve core issues raised in the case, expressly declining to consider legal arguments necessary to determine C.P.'s rights under federal and state law.

98. In its own words, the OAL stated that it would not address issues relating to "the amount of the reimbursement cap" or "the legal authority for requiring compliance with the District's criteria," preserving those matters for potential appellate review. By doing so, the OAL abdicated its statutory obligation to provide an impartial administrative decision on the merits.

99. The OAL's refusal to address those issues directly affected Plaintiff's ability to obtain relief. The agency ignored arguments demonstrating that the district's failure to respond to a request for independent evaluations within twenty days violated New Jersey law; that the State's implementing regulations were more protective than federal counterparts.

100. In rendering the Remand Decision, the OAL ignored that the District could not insist on compliance with criteria that it had never provided to the Mother in violation of New Jersey regulations.

101. In rendering the Remand Decision, the OAL ignored that equity estopped the District from relying on criteria that it had never provided to the Mother.

102. In rendering the Remand Decision, the OAL ignored that the District's criteria remained incomplete because the District's Board of Education had never established cost criteria as it directed itself to do, and never properly adopted by its board of education.

103. The OAL further disregarded equitable defenses such as estoppel, which precluded the district from enforcing criteria it had never disclosed to the parent.

104. Instead, the OAL concluded without any supporting record, that the "[IEEs] are now outdated."

105. By issuing the Remand Decision in this manner, the OAL functionally insulated the district from accountability, disregarded the rights of the parent and student, and perpetuated bias in Plaintiff's administrative proceeding.

106. As a direct and proximate result of the State's conduct, C.P. incurred unreimbursed legal fees, lost the value of educational services delayed or denied to her child, and non-economic harm.

107. The NJDOE and OAL's conduct in Plaintiff's proceeding constitutes action under color of state law actionable under 42 U.S.C. §1983.

108. The Remand Decision must therefore be vacated to restore to C.P. and F.P. the rights guaranteed by federal and state law and to compensate them for the damages caused by the State's unlawful practices.

109. On multiple occasions, Paredes was offered a settlement if she waived her right to attorneys' fees. She refused, and that was the sole reason settlement was not reached.

***The U.S. Department of Education Findings***

110. On August 18, 2018, the U.S. Department of Education (the "US-DOE") informed the NJ-DOE that it would be conducting an on-site visit, which would "focus primarily on a review of the [NJ-DOE]'s dispute resolution system." The US-DOE asked to meet with the NJ-DOE "staff involved in, and responsible for, the oversight of this area within the [NJ-DOE]."

111. The On-Site Visit was conducted on September 20-21, 2018.

112. In response to the US-DOE's request, the NJ-DOE provided data indicating, *inter alia*, the following:

A. In school year 2015-16, one thousand two hundred and thirty four (1,234) due process complaints were filed. Of these, fifty eight (58) were resolved within the timeline.[7] This amounts to compliance with the timeline in 5% of cases.

B. In school year 2016-17, one thousand two hundred and ninety two (1,292) due process complaints were filed. Of these, fifty two were resolved within the timeline.[8] This amounts to compliance with the timeline in 4% of cases.

113. The US-DOE scheduled the on-site visit, in part, because it had received complaints "related to the way the [NJ-DOE] calculates the 45-day timeline with respect to issuing a final hearing decision."

114. "One complaint alleged that the [NJ-DOE] counts "Federal days" instead of calendar days in calculating the 45-day timeline. According to the complaint, ALJs only count days as "Federal days" against the 45-day timeline when an action took place with regards to the hearing."

115. "As an example: once a due process hearing request is transferred to the State's OAL, a settlement conference is held; Second, within days to weeks,

---

[7] This calculation relies upon the generous assumption of the validity of NJ-DOE's methodology. *But see infra* at ¶¶106-108 (indicating that US-DOE found NJ-DOE out of compliance with the timelines, in part, because of the use by the OAL of the fictional "federal days" nomenclature.

[8] *Id.*

a prehearing conference is held with the ALJ and both parties to schedule hearing dates. Third, within days to weeks, a hearing is held. These three actions are considered as three (3) 'Federal days' and are counted against the 45-day timeline, but the days and weeks between each action are not counted when calculating the 45-day timeline."

116. "During the on-site visit, [US-DOE] discussed this practice with NJ-DOE officials who also confirmed that ALJs who serve as hearing officers use 'Federal days,' rather than calendar days in calculating the 45-day timeline. The [NJ-DOE] was unable to provide its definition of 'Federal day' or method for calculating the 45-day timeline, and acknowledged that it does not have a mechanism for ensuring that ALJs who serve as hearing officers are reaching hearing decisions and mailing a copy of the decision to the parties within the 45-day timeline. Proper calculation of the due process hearing decision timeline using calendar days is essential to ensuring the timely resolution of due process complaints filed by parents and school districts on matters relating to the identification, evaluation, educational placement of a child with a disability, or the provision of a free appropriate public education to the child."

117. "Regarding extensions of the 45-day timeline, NJ-DOE explained to [US-DOE] that when an ALJ grants an extension to the 45-day timeline, an adjournment is granted pursuant to *N.J.A.C.* 1:6A-9.2. While this [NJ-DOE]

provision, on its face, is consistent with 34 C.F.R. §300.515(c), NJ-DOE staff acknowledged that they have no mechanism to ensure that adjournments are granted at the request of a party and that the ALJ specifies either the length of the adjournment or the date by which the decision will be mailed to the parties."

118. US-DOE formed the following conclusions, as a result of its on-site visit and the information gathered there:

A. NJ-DOE "does not have procedures for ensuring that decisions in due process hearings are issued within the 45-day timeline or within allowable extensions, because: (i) [NJ-DOE] does not have procedures for ensuring that ALJs who serve as hearing officers use calendar days, consistent with the definition of day in [applicable federal regulations] for reaching a final decision in a due process hearing and mailing the decision to each of the parties; and (ii) the State does not have procedures for ensuring that ALJs who serve as hearing officers grant adjournments, as set forth in [state regulations], consistent with the provision for granting extensions of the 45-day timeline in [federal regulations] for a specific period of time and at the request of a party.

B. "Consequently, NJ-DOE has failed to exercise its general supervisory and monitoring responsibility pursuant to [statute and regulation.]"

C. "Because the NJ-DOE does not have procedures for ensuring that hearing decisions reached within the 45-day timeline or an allowable extension is properly calculated, the [NJ-DOE] cannot ensure that its IDEA section 618 Dispute Resolution Data submission on fully adjudicated hearings completed within timeline and within extended timelines is accurate."

***Report By New Jersey Special Education Practitioners***

119. In 2016, the New Jersey Special Education Practitioners ("NJSEP")[9] created a task force to study the State of New Jersey's compliance with the 45 Day Rule. The study was extensive and reviewed NJ-DOE's own statistics, data documented in one hundred fifty five (155) final decisions dated between July 2, 2014 to December 22, 2017 related to special education disputes filed between September 27, 2012 and December 19, 2017.

120. In March 2018, the Report of New Jersey Special Education Practitioners was submitted to New Jersey Governor Phil Murphy with copies to Defendant Commissioner Allen-McMillan; ALJ Lisa James- Beavers, Acting Director and Chief ALJ at the OAL; and, John Worthington, Director of OSEP; among others, on March 21, 2018 ("NJSEP 45 Day Report").[10]

121. The NJSEP 45 Day Report found that, despite the federal and state law requirement that special education cases brought pursuant to IDEA be decided within 45 days of the conclusion the 30-day resolution period, <u>on average</u> such

---

[9] NJSEP consists of more than one hundred (100) attorneys and professional advocates in the State of New Jersey who represent exclusively children with disabilities and their parents in special education disputes.

[10] John Rue served on the NJSEP 45-day task force. *See* NJSEP 45 Day Report at 3, n.6, available at https://edlawcenter.org/assets/files/pdfs/issues-special-education/NJSEP_45_DAY_REPORT_w_APPENDIX_M.pdf.

cases took three hundred twelve (312) days[11] to be adjudicated.[12] The 45 Day Report found New Jersey was noncompliant dating back to 2011.

122. NJSEP called upon those with authority, Governor Murphy, the NJ-DOE, and the OAL, to take immediate action to rectify noncompliance.

***Internal OAL Tracking***

123. On September 27, 2017, the Innisfree Foundation, a non-profit organization, made a public records request to the NJ-DOE, seeking "the document tracking 'federal days' for all special education due process proceedings that were initiated from January 1, 2014 to present."

124. On December 19, 2017, the NJ-DOE produced the tracking document requested.

125. The document shows that the NJ-DOE was out of compliance with the 45 Day Rule and, at least as of the end of 2017, and had been out of compliance for some time.

---

[11] This number reflects cases that did not seek emergent relief or special education discipline cases, which must be adjudicated on an expedited bases pursuant to 20 U.S.C. §1415(k)(3), & 34 C.F.R. §300.532(c).

[12] The number of days that elapsed between that date the due process petition was transmitted to the OAL as a contested matter, and the date of the final decision in the matter ranged from one (1) to one thousand, one hundred seventy-eight (1,178) days.

***Illustrative Case Example***

126. By way of example only, in one particular case, which was presided over by the Chief Judge of the OAL,[13] the petition was transmitted on March 3, 2015. The following procedure ensued:

A. A three-day hearing was convened, beginning on June 1, 2015, i.e., **ninety (90) days** after transmittal.[14]

B. But that did not complete the hearing, and three more hearing days were convened on June 17, 2015; September 14, 2015; and September 15, 2015. Thus, the live hearing concluded **one hundred and ninety six days** (196) days after transmittal.[15]

C. Subsequently, written summations were submitted, and the record closed on November 5, 2015, i.e., **two hundred and forty seven** (247) days after transmittal.[16]

D. The case then went dormant for some time. Finally and at last, on March 12, 2019, i.e., **one thousand four hundred and seventy days** after transmittal, the case was decided.[17]

E. Although the opinion makes no reference to any requests to any specific requests for adjournments made by either party, none would have been relevant after the record closed.

127. NJ-DOE knows or should know that it does **not** ensure timely resolution of special education disputes within forty-five days.

---

13 *D.D. & D.D. o/b/o S.D. v. West Windsor-Plainsboro Reg'l Bd. of Edu*., OAL DKT. NO. EDS 3079-15, Agency DKT. NO. 2015 22224, at 1, *available at* https://www.state.nj.us/education/legal/specialed/2019/mar/2015-22224.pdf.

14 *Id.* at 2.

15 *Id.*

16 *Id.*

17 *Id.* at 1.

***NJ-DOE's Response to USDOE Monitoring***

128. On August 6, 2019, NJ-DOE issued a memorandum entitled "Revised Procedures for Conducting Special Education Due Process Hearings"[18] which states, in relevant part, that beginning on September 1, 2019, OAL must submit to NJ-DOE, on a monthly basis, documentation with the following information:

A. Number of due process hearings conducted;

B. Number of due process hearings resolved;

C. Number of due process hearings pending before all ALJs;

D. Number of extensions of the 45-day timeline requested, including the party seeking the extension of time and the reason for the request;

E. Number of extensions of the 45-day timeline granted by each ALJ; and

F. For each extension of the 45-day timeline granted, the OAL must include the revised due date of the final decision.

129. That memorandum indicates that beginning "October 1, 2019, and occurring on a monthly basis thereafter, the Department will publish, on its website, all of the above information."

130. Notwithstanding that representation, NJ-DOE has not published any of that information on its website.

---

[18] The memorandum is available at https://www.nj.gov/education/specialed/fmr/SpecialEducationDueProcessHearings.pdf.\

131. Even more concerning, when presented with a February 7, 2020 Open Public Records Act request seeking the same information, as well as links to the NJ-DOE website where the information is published, NJ-DOE did not provide the documents. Instead, on February 19, 2020, NJ-DOE informed the requestor that it needed additional time to respond and granted itself an extension of the due date to February 27, 2020.

132. Pursuant to the New Jersey Open Public Records Act ("OPRA"), if the custodian of government records reasonably believes that he or she will be unable to respond to a particular request within seven days of its receipt, because of either the complexity of the subject matter requested, or the breadth of the request, it should so advise the requestor in writing. If the parties are thereafter unable to agree upon an extension of time for the custodian to respond, the request would be deemed denied under the express provisions of *N.J.S.A*. 47:1A-5(i). If NJ-DOE has been collecting this information as required by the corrective action plan, there would be no basis for an extension.

133. On January 14, 2020, Dr. Peggy McDonald (Assistant Commissioner, NJ-DOE) and the Honorable Ellen S. Bass (Acting Director/Chief ALJ, OAL) wrote to the director of Office of Special Education Programs, United States Department of Education and made the following representations:

A. “Since your findings of noncompliance were issued in May 2019, working together, our agencies have developed Guidelines governing the conduct of special education due process hearings.”

B. “Following stakeholder review and input, and revision if necessary, the Guidelines will go into effect on March 2, 2020.”

C. “Additionally, each month, the OAL will collect and report to [NJ-DOE] specific due process hearing data, including the number of due process hearings conducted, the number of hearings resolved, the number of hearings pending, and the number of hearings with extended timelines, including the party seeking the extension of time and the reason for the request.”

D. “Moreover, the NJ-DOE and the OAL ***have executed*** a revised interagency Memorandum of Agreement (MOA) . . . The corrective action activities described above as well as the revised MOA demonstrate our collective commitment to ensure New Jersey’s special education dispute resolution system functions to meet the needs of students with disabilities.”

134. The administrative practices described above were ongoing at the time Plaintiff pursued her due process petition and continued during the pendency of related federal litigation addressing the administration of special education due process proceedings in New Jersey. The conduct alleged herein arises from the same core adjudicatory practices and timeline calculations that were the subject of those proceedings and continues to affect Plaintiff’s ability to obtain timely and impartial review.

## CAUSES OF ACTION

### COUNT ONE
### Violation of Plaintiff's Right to an Impartial Due Process Hearing under the IDEA and N.J.A.C. 6A:14-1, *et seq*.
### NJ-DOE and Commissioner Dehmer

135. Plaintiff repeats and realleges the preceding allegations of this Complaint and incorporates them herein by reference as if set forth in full.

136. NJDOE, as State Education Agency (SEA), receives federal funding and is, pursuant to 20 U.S.C. §1415(a), charged with responsibility to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education . . . ."

137. Commissioner Kevin Dehmer is the chief executive school officer of New Jersey and the head of the NJ-DOE.

138. The OAL accepts delegated authority from NJDOE to conduct due process hearings arising out of special education disputes.

139. Among the procedural safeguards is the right to an impartial due process hearing before a hearing officer with adequate training, skills and knowledge of the IDEA.

140. Any person conducting special education hearings must possess knowledge of, and the ability to understand, the provisions of the IDEA, Federal and State

regulations pertaining to the IDEA, and legal interpretations of the IDEA by Federal and State courts. 20 U.S.C. §1415(f)(3)(A)(ii).

141. Any person conducting special education hearings must possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice. 20 U.S.C. §1415(f)(3)(A)(iv).

142. The Remand Decision improperly ignored federal and New Jersey regulations pertaining to the IDEA, as well as the legal interpretations given to those regulations by the courts.

143. The Remand Decision improperly ignored legal doctrines, as well as the legal interpretations given to those doctrines by the courts.

144. The Remand Decision ignored numerous material facts and determined other facts without any support.

145. The Remand Decision improperly ignored numerous motions that remained undecided.

146. The Remand Decision constitutes a denial of the right to a fair and impartial due process hearing by a hearing officer knowledgeable in the federal and state regulations pertaining to the IDEA and legal interpretations of the IDEA.

147. The Remand Decision constitutes a denial of the right to a fair and impartial due process hearing by a hearing officer with the knowledge and ability to render and write decisions in accordance with appropriate legal practice.

148. ALJ Celentano failed to behave impartially in the initial due process hearing.

149. ALJ Celentano failed to act as one who had received effective training in the IDEA during the initial due process hearing.

150. The OAL failed to ensure that C.P. receive an impartial due process hearing conducted by an impartial hearing officer acting in compliance with IDEA standards and governing regulations, including but not limited to entirely ignoring a complaint filed with the Chief Judge of the OAL about Judge Celentano's improper conduct and incompetent performance.

151. NJ-DOE, the OAL, and Commissioner Dehmer have failed to ensure an impartial due process hearing by an impartial hearing officer acting in compliance with IDEA standards and governing regulations.

152. NJ-DOE, the OAL, and Commissioner Dehmer have failed to ensure an impartial due process hearing by an adequately trained hearing officer.

153. NJ-DOE's, the OAL, and Commissioner Dehmer's denial of rights guaranteed by the IDEA constitutes a violation of the IDEA and has damaged Plaintiff.

**COUNT TWO**
**Appeal pursuant to 20 U.S.C. § 1415**
**Clifton Board of Education**

154. Plaintiff repeats and realleges the preceding allegations of this Complaint and incorporates them herein by reference as if set forth in full.

155. This Count seeks review of the administrative decision pursuant to 20 U.S.C. § 1415(i)(2). Plaintiff's claims for damages are asserted separately below.

156. Section 1415(i)(2) provides any party aggrieved by the findings and decisions in a due process matter the right to bring a civil action with respect to its due process complaint.

157. Plaintiff is a party aggrieved by the decisions below, including the Remand Decision.

158. The IDEA and federal regulations provide a mechanism by which a parent can request an IEE.

159. A school district is provided with two, and only two, options in response to a parental request for an IEE.

160. New Jersey law provides further protections for students and parents, including imposing a specific deadline for a school district's response, the manner and content of that response, and the elimination of a post-IEE challenge.

161. The District failed to comply with its obligations to respond to the Mother's IEE request within the time and in the manner required by state and federal regulations.

162. The decision of the OAL should have been rendered in favor of Plaintiff.

163. Instead, as alleged herein, the Remand Decision ignored factual issues presented and thereby reached an erroneous conclusion.

164. Instead, as alleged herein, the Remand Decision ignored legal issues and thereby reached an erroneous conclusion.

165. The OAL erred when it granted judgment in favor of the District in the Remand Decision.

166. Plaintiff has been damaged by the erroneous conclusion of the Remand Decision.

167. The Remand Decision must be reversed to restore to C.P. and F.P. the rights guaranteed to them by federal law.

168. The Remand Decision must be reversed to restore to C.P. and F.P. the rights guaranteed by state law.

169. The Remand Decision must be reversed.

170. As a direct and proximate result of the acts and omissions alleged herein, Plaintiff has sustained the following injuries and losses, all of which are compensable under 20 U.S.C. § 1415(i)(3)(B), 42 U.S.C. § 1983, and applicable state law:

A. Economic losses consisting of:

- Reasonable attorneys' fees and costs wrongfully waived, denied, or withheld through coercive settlement practices;

- The value of time and resources expended to secure educational services delayed or denied by unlawful procedures; and
- Lost educational benefits to F.P. resulting from delay and administrative non-compliance.

B. Consequential and non-economic damages;

C. Equitable and restitutionary relief specific to Plaintiff, including:

- Restitution of all attorneys' fees wrongfully waived;
- Injunctive measures necessary to restore the integrity of any remand of Plaintiff's due process proceeding.

171. The quantum of monetary relief shall be proven at trial.

172. Plaintiff further seeks an award of attorneys' fees and costs under 42 U.S.C. § 1988 and 20 U.S.C. § 1415(i)(3)(B), together with pre- and post-judgment interest and such other relief as the Court deems just and proper.

**COUNT THREE**
**VIOLATION OF IDEA AND PROCEDURAL DUE PROCESS**
**(42 U.S.C. § 1983)**

(Against the New Jersey Department of Education, Office of Administrative Law, Commissioner of Education in her Official Capacity, and Clifton Board of Education)

173. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

174. The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., requires each participating State to ensure that parents of children with

disabilities are provided an impartial due-process hearing and a written decision issued "not later than 45 days after the expiration of the 30-day resolution period." 20 U.S.C. § 1415(f)(1)(B)(ii); 34 C.F.R. § 300.515(a).

175. The IDEA further provides that a prevailing parent "may be awarded reasonable attorneys' fees as part of the costs." 20 U.S.C. § 1415(i)(3)(B). This fee-shifting provision is an essential structural safeguard, enacted to ensure equal access to justice and to prevent economic coercion by publicly funded school districts.

176. The Fourteenth Amendment to the United States Constitution guarantees that no State shall deprive any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. The right to recover statutory attorneys' fees under the IDEA is a protected property interest within the meaning of the Due Process Clause.

177. At all relevant times, the New Jersey Department of Education ("NJDOE") and the Office of Administrative Law ("OAL") acted under color of state law and in their capacities as recipients of federal IDEA funds. They were therefore obligated to administer Plaintiff's due process hearing in conformity with federal law and constitutional due-process requirements.

178. Instead, the NJDOE and OAL, as applied in Plaintiff's proceeding, maintained and enforced practices that deprived Plaintiff of those rights, including:

A. Failing to ensure that due-process hearings were completed within the forty-five-day timeline mandated by 34 C.F.R. § 300.515;

B. Allowing and encouraging school districts to condition settlement on the waiver of statutory attorneys' fees;

C. Counting "federal days" rather than calendar days when measuring compliance with the 45-day rule;

D. Permitting adjournments and continuances without the consent of the parties and without specifying the duration of any extension; and

E. Failing to monitor, correct, or report these violations despite repeated federal findings of non-compliance.

179. The NJDOE and OAL, in administering Plaintiff's due process proceeding, operated in a manner that functioned as a de facto mechanism of coercive settlement rather than impartial adjudication.

180. The Clifton Board of Education, knowingly participated in and benefited from this system by conditioning settlements on fee waivers, exploiting the State's unlawful delay practices, and thereby depriving plaintiff of procedural and property rights guaranteed by federal law.

181. The practices described above, as implemented in Plaintiff's proceeding, were the moving force behind the deprivation of Plaintiff's statutory and

constitutional rights. They reflect deliberate indifference by State officials and local districts to the procedural safeguards Congress intended to guarantee.

182. As a direct and proximate result of these unlawful practices, Plaintiff suffered measurable and compensable injury, including:

183. Loss of recoverable attorneys' fees and costs;

184. Out-of-pocket legal expenses incurred to vindicate educational rights;

185. Delay and denial of services to which F.P. was legally entitled; and

186. Non-economic harm arising from the deprivation of procedural due process and coercive fee-waiver pressure.

187. The conduct of the NJDOE and OAL constitutes a violation of 20 U.S.C. § 1415, 34 C.F.R. § 300.515, and the Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983.

188. The conduct of the Clifton Board of Education likewise constitutes joint participation in, and ratification of, the same unconstitutional and unlawful practices.

189. Plaintiff therefore seeks the following relief:

A. A declaration that the practices applied in Plaintiff's administrative proceeding violate the IDEA and the Fourteenth Amendment;

B. Compensatory damages for all economic and consequential losses, including the value of fees wrongfully waived or withheld;

C. Non-economic harm arising from the deprivation of procedural due process and coercive fee-waiver pressure; and

D. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 20 U.S.C. § 1415(i)(3)(B).

190. The quantum of monetary relief is to be established at trial.

**COUNT FOUR**
**Civil Conspiracy (NJ common law)**
**(The OAL, NJDOE, and Clifton Bd. of Edu.)**

191. Plaintiff repeats and realleges the preceding allegations of this Complaint and incorporates them herein by reference as if set forth in full.

192. At all relevant times, Defendants NJDOE, OAL, and Clifton acted in combination with one another with respect to the adjudication and disposition of Plaintiff's special education dispute, including the handling of Plaintiff's due process petition, the conduct of proceedings before the OAL, and the resolution of issues affecting Plaintiff's statutory rights, including fee-shifting rights.

193. NJDOE is responsible for establishing and maintaining IDEA-compliant procedures and for ensuring that due process disputes are administered in conformity with federal and State timelines and procedural safeguards. NJDOE delegated to the OAL the function of conducting due process hearings

and issuing decisions, and NJDOE relied on the OAL to implement and enforce the State's dispute-resolution system as applied to Plaintiff.

194. Clifton, as the local educational agency, was an adversarial party in Plaintiff's administrative proceedings. Clifton repeatedly used its position as the publicly funded party, and its access to counsel and process control, to seek procedural advantage and to condition meaningful relief on Plaintiff's surrender of statutory rights.

195. Defendants entered into an agreement, understanding, or meeting of the minds to achieve an unlawful objective, or to achieve a lawful objective through unlawful means, namely: to deprive Plaintiff of the fair and impartial adjudication guaranteed by the IDEA and New Jersey regulations, to insulate Clifton from accountability for violations of those requirements, and to pressure Plaintiff to accept educational relief, if any, only on terms that included the waiver of Plaintiff's entitlement to recover reasonable attorneys' fees and related litigation costs where permitted by law.

196. In furtherance of that agreement, the OAL, acting through its assigned Administrative Law Judge, repeatedly declined to adjudicate dispositive motions that were fully briefed and ripe for decision, including Plaintiff's motions for summary disposition and sanctions. Rather than resolving those motions on the merits as required by governing rules, the adjudicator allowed

the matter to remain pending while settlement discussions continued, thereby increasing litigation costs and procedural leverage in favor of Clifton.

197. At the same time, Clifton was permitted to withdraw settlement offers, seek adjournments, and cure procedural deficiencies without meaningful consequence, including deficiencies that would otherwise have supported exclusion of evidence or other sanctions. The adjudicatory decisions to postpone rulings and extend proceedings operated in practical effect to shield Clifton from accountability and to pressure Plaintiff to accept resolution on terms favorable to the District.

198. The combined effect of these actions departed from neutral case management and materially advantaged Clifton within the adjudicatory process. Taken together, they reflect coordinated conduct between Clifton and the adjudicatory apparatus that advantaged the District and deprived Plaintiff of the fair and impartial hearing guaranteed by federal and State law.

199. Clifton Board of Education is a separate local governmental entity, distinct from the State and its agencies. Its participation in the conduct described herein, together with the actions of the OAL and NJDOE, constitutes a conspiracy among legally distinct actors.

200. The agreement and shared objective among Defendants may be inferred from the coordinated manner in which (a) Plaintiff's dispositive motions were

ignored or left unresolved, (b) the adjudication was delayed far beyond required timelines without lawful extensions requested by a party and specified for a defined period, (c) procedural rules were applied selectively to excuse Clifton's failures while disadvantaging Plaintiff, and (d) the adjudicatory process was used to create settlement pressure on Plaintiff to accept relief only by surrendering fee-shifting rights and other procedural protections.

201. In furtherance of the conspiracy, one or more Defendants committed overt acts, including but not limited to the following:

A. Permitting Clifton to withhold required responses and disclosures, and then using adjournments and scheduling decisions to allow Clifton to cure failures that, under governing rules, should have resulted in exclusion of evidence or other corrective relief.

B. Refusing to decide dispositive motions and sanctions motions that were fully briefed and ripe for decision, and instead communicating to counsel that the matter would not be decided on the merits unless it settled, thereby using the adjudicatory process as leverage rather than as a neutral forum.

C. Allowing the administrative process to extend far beyond the required timelines without lawful, party-requested, specific

extensions, and without issuing a timely decision based on the evidence and arguments presented.

D. Issuing a remand disposition that declined to decide core legal questions necessary to resolve Plaintiff's claims, thereby insulating Clifton from accountability and forcing Plaintiff into continued litigation expense and delay.

E. Tolerating, ratifying, or failing to prevent Clifton's settlement posture that conditioned meaningful relief on Plaintiff's waiver of attorneys' fees and costs, and allowing that posture to function as an extrajudicial pressure mechanism within the due process system.

202. Defendants' overt acts were not isolated errors. They reflect coordinated conduct that advanced the shared objective of burdening and increasing the cost of Plaintiff's enforcement of her statutory rights.

203. As a direct and proximate result of Defendants' civil conspiracy and the underlying wrongful acts carried out in furtherance of it, Plaintiff suffered damages including, without limitation, unreimbursed legal fees and expenses, delay-related educational harm, additional costs incurred to pursue relief that should have been available through a fair process, and other consequential damages as proven at trial.

204. Defendants are jointly and severally liable for damages arising from the civil conspiracy alleged herein.

205. Plaintiff therefore demands judgment against Defendants NJDOE, OAL, and Clifton on this Count for compensatory damages, consequential damages, and such other relief as the Court deems just and proper.

206. The agreement alleged herein need not have been formal or express. It may be inferred from the coordinated sequence of actions described above, which operated in practical effect to disadvantage Plaintiff and advantage Clifton within the adjudicatory process.

**COUNT FIVE**
**BREACH OF FIDUCIARY DUTY AND**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Robert Thurston and Thurston Law Offices; and**
**Against NJDOE for Aiding and Abetting)**

207. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

208. Taken together, these settlements reflect a recurring mechanism by which claims arising from systemic violations are resolved through payments to counsel and narrowly confined relief, while avoiding class certification, judicial findings on the merits, and the creation of broadly enforceable remedies. This mechanism operates to extinguish or suppress claims

belonging to a larger population of affected families without providing commensurate relief to that population.

209. At all relevant times, Defendant Robert Thurston, individually and through Thurston Law Offices, stood in a fiduciary relationship to members of the C.P. class and the overlapping putative class in J.A. v. New Jersey Department of Education. That fiduciary relationship arose from his role as counsel purporting to act on behalf of class representatives and absent class members in related proceedings.

210. In Joanna A. et al. v. New Jersey Department of Education, a putative class action alleging systemic violations of the Individuals with Disabilities Education Act and related statutes, the State Defendants entered into a consent order and settlement agreement that expressly provided the case would not be certified as a class action, included broad releases of claims, and resulted in the payment of approximately $297,500 in attorneys' fees to Thurston Law Offices, while providing only nominal payments of $2,500 to each of the three named plaintiffs.

211. The J.A. litigation proceeded in parallel to, and drew upon the same underlying systemic failures and legal theories as, the C.P. class action, thereby positioning counsel to leverage overlapping claims and procedural posture across proceedings.

212. The settlement was embodied in a federally enforceable consent order in which the Court retained jurisdiction, and which included a complete release of claims against the State Defendants arising from the alleged systemic violations.

213. The injunctive and procedural provisions of that settlement do not confer meaningful or enforceable benefits on absent class members or similarly situated families. Because the action was not certified as a class action, the settlement creates no mechanism by which non-parties may enforce its terms. Any purported systemic relief is therefore effectively limited to the named plaintiffs, who lack both incentive and practical ability to ensure statewide compliance, rendering the relief illusory as to the broader population affected by the underlying violations.

214. No provision of the settlement establishes a mechanism for monitoring statewide compliance, appoints an independent enforcer, or confers standing on non-parties to compel adherence, further confirming that the purported relief lacks practical enforceability beyond the named plaintiffs.

215. Moreover, the relief obtained in that settlement largely restates obligations already imposed on Defendants by existing federal and state law, including IDEA and its implementing regulations, as well as obligations addressed in related proceedings. The settlement does not materially expand or strengthen

enforceable rights beyond those already available and does not represent a meaningful advancement of relief commensurate with the claims asserted.

216. On information and belief, this settlement structure is not isolated. In multiple related matters involving overlapping claims against the same Defendants, including cases resulting in payments of approximately $150,000 and $190,000, settlements have followed a similar pattern: substantial payments directed to counsel, broad releases of claims against State actors, and limited or non-systemic relief to affected families. These repeated outcomes are consistent with a method of resolving claims arising from the same underlying systemic violations alleged herein.

217. As a fiduciary, Thurston owed duties of loyalty, candor, and good faith, including the obligation to act in the best interests of the class as a whole and to refrain from self-dealing, conflicts of interest, or conduct that subordinated class interests to her own financial gain.

218. This fiduciary duty arises from Thurston's representation of class-based claims and her exercise of authority affecting the rights of absent class members.

219. Thurston breached those duties.

220. That breach included entering into settlements that extinguished or compromised claims belonging in part to absent or similarly situated class

members while securing substantial personal financial benefit, without obtaining proportionate or enforceable relief for those whose interests he purported to advance.

221. Specifically, Thurston used her position and access derived from the C.P. class action and related proceedings to negotiate and secure settlements in separate but overlapping matters—including her own individual cases and the J.A. litigation—that provided:

a) minimal or illusory substantive relief to class members; and

b) disproportionate and self-interested attorneys' fees and financial benefits to himself.

222. Thurston's ability to obtain these settlements was derived, in substantial part, from her role and positioning in litigation affecting broader groups of similarly situated individuals, including proceedings related to the C.P. class action. By leveraging claims, information, and procedural posture associated with those broader proceedings to resolve separate matters for disproportionate personal compensation, Thurston subordinated the interests of absent class members and similarly situated families to her own financial interests.

223. These settlements were not the product of arms-length representation of class interests. Rather, they were structured to convert Thurston's access to class

claims and leverage into personal compensation, at the expense of the very class members to whom he owed fiduciary duties.

224. Among other things, Thurston:

a) Permitted or agreed to the abandonment or dilution of classwide claims in exchange for attorneys' fees;

b) Negotiated resolutions that provided nominal payments to individual plaintiffs while securing substantial fee awards for himself;

c) Leveraged overlapping class definitions and tolling doctrines to extract value from claims belonging to absent class members without securing corresponding relief for those members; and

d) Used her purported role in class litigation to enhance her bargaining position in unrelated or parallel proceedings for personal gain.

225. This conduct constitutes classic self-dealing. Thurston placed her own financial interests above those of the class, diverted litigation value to himself, and failed to disclose or adequately account for conflicts inherent in those transactions.

226. As a direct and proximate result of these breaches, Plaintiff and similarly situated class members suffered harm, including:

a) Loss of the full value of their claims;

b) Loss of leverage that would have existed in the absence of conflicted settlements;

c) Delay and impairment of classwide relief; and

d) Diversion of settlement value into attorneys' fees not earned in the interest of the class.

227. Defendant New Jersey Department of Education ("NJDOE") knowingly aided and abetted Thurston's breaches of fiduciary duty.

228. Defendants NJDOE and OAL were aware of the structure and effect of these settlements, including the disproportionate allocation of funds to counsel, the use of broad releases, and the absence of classwide enforceable relief.

229. NJDOE had actual knowledge of the structure and effect of the settlements described above, including the disproportionate allocation of value to attorneys' fees and the abandonment or dilution of class claims. NJDOE further understood that Thurston was purporting to act in a representative capacity affecting the rights of absent class members.

230. Despite that knowledge, NJDOE provided substantial assistance to Thurston's misconduct by:

a) Negotiating and entering into settlements that prioritized fee payments over substantive class relief;

b) Accepting and exploiting Thurston's conflicted position to obtain releases or limitations of liability broader than the relief provided;

c) Participating in agreements that contemplated dismissal or narrowing of class claims in exchange for payments to counsel;

d) And otherwise ratifying and benefiting from the diversion of value away from class members.

231. NJDOE's conduct was not passive. It affirmatively facilitated Thurston's breaches by structuring and consummating agreements that depended on her willingness to subordinate class interests to her own compensation.

232. The combination of Thurston's fiduciary breach and NJDOE's knowing assistance resulted in a coordinated transfer of value from class members to counsel and the State, undermining the integrity of both the C.P. and J.A. proceedings.

233. As a direct and proximate result of the foregoing, Plaintiff has suffered damages, including economic loss, delay-related harm, and deprivation of the fair value of claims belonging to her and the class.

234. The practices described herein undermine the integrity of representative litigation and distort the function of class-based proceedings by converting collective claims into vehicles for individualized financial recovery by counsel.

**WHEREFORE**, Plaintiff demands judgment against Defendants Robert Thurston, Thurston Law Offices, and the New Jersey Department of Education as follows:

A. Compensatory damages in an amount to be proven at trial;

B. Disgorgement of all fees and financial benefits obtained by Thurston as a result of her breaches of fiduciary duty;

C. Restitution of value diverted from class members through conflicted settlements;

D. Joint and several liability against NJDOE for aiding and abetting those breaches;

E. Equitable relief invalidating any agreements procured through such breaches to the extent necessary to restore class rights;

F. And such other relief as the Court deems just and proper.

## DAMAGES

235. As a direct and proximate result of Defendants' failure to provide a timely and impartial due process hearing in accordance with the IDEA and governing regulations, Plaintiff incurred additional attorneys' fees and litigation costs that would not have been incurred had the matter been adjudicated within the timelines required by law.

236. Specifically, because dispositive motions were left unresolved, because the administrative proceedings extended well beyond the forty-five (45) day period without lawful, party-requested extensions of defined duration, and because the Remand Decision declined to resolve core issues necessary to dispose of Plaintiff's claims, Plaintiff was required to continue litigating issues that should have been resolved earlier in the administrative process.

237. The additional fees and costs incurred include, but are not limited to: attorneys' fees for briefing and arguing motions that were not decided when ripe; fees incurred in pursuing remand proceedings; expert and evaluation-related expenses; and other out-of-pocket litigation costs directly attributable to delay and improper adjudication.

238. To the extent the OAL determined that the requested independent educational evaluations were "outdated," such determination was itself a direct consequence of the delay in adjudication. Any resulting denial or limitation of reimbursement is therefore proximately caused by Defendants' failure to comply with statutory timelines and procedural safeguards.

239. Plaintiff has also suffered consequential damages in the form of delay-related educational harm to F.P., including the loss of timely implementation of appropriate evaluations and services that would have informed and improved the development of F.P.'s educational program.

240. The foregoing damages are concrete, measurable, and were reasonably foreseeable consequences of Defendants' conduct. Plaintiff seeks recovery of all damages available under the IDEA, 42 U.S.C. §1983, and other applicable law, including compensatory and consequential damages, together with reasonable attorneys' fees and costs as permitted by statute.

241. The harms described herein arise from the adjudicatory practices applied in Plaintiff's administrative proceedings.

## PRAYER FOR RELIEF

242. WHEREFORE, Plaintiff seeks the entry of Judgment in her favor and against defendants New Jersey Department of Education, the Office of Administrative Law, Acting Commissioner of Education Kevin Dehmer, and Clifton Board of Education for an Order:

A. Requiring the NJ-DOE and Commissioner Dehmer to ensure that any remand of the due process hearing is resolved in accordance with the Forty Five Day Rule;

B. Reversing the Remand Decision, inclusive of any prior decisions in this matter, and entering judgment in favor of the Mother;

C. Awarding reimbursement to the Mother for the subject IEEs in an amount determined by the Court; and

D. Awarding reasonable fees and costs to the mother.

243. Declare that the coercive conditioning of settlements upon waiver of attorneys' fees constitutes a denial of due process and an unlawful deprivation of a statutory property interest.

**Injunctive and Equitable Relief**

244. Permanently enjoin the NJDOE, the OAL, and Clifton from conditioning any settlement or resolution of a due process petition on a waiver of attorneys' fees or other statutory rights under the IDEA.

245. Order the NJDOE and OAL to ensure compliance with the 45-day rule and impartial adjudication in any remand of Plaintiff's proceeding.

**Monetary and Restitutionary Relief**

246. Award compensatory damages to Plaintiff for:

A. Loss of recoverable attorneys' fees and costs wrongfully waived or denied;

B. Out-of-pocket legal expenses;

C. Delay-related educational losses suffered by F.P.; and

D. Non-economic harm arising from the deprivation of procedural due process and coercive fee-waiver pressure.

247. Award restitution and disgorgement of sums wrongfully obtained or retained by Clifton through coercive settlements.

**Attorneys' Fees and Costs**

248. Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 20 U.S.C. § 1415(i)(3)(B), and any other applicable provision of law.

## **Further Relief**

249. Grant such other and further relief as this Court deems just, proper, and equitable, and to deter recurrence of the misconduct alleged herein.

## JURY DEMAND

250. Plaintiff demands a trial by jury on all issues so triable.

John Rue
John Rue & Associates, LLC
(aka Rue Law Group)
100 Overlook Center
2nd Floor, #9211
Princeton, NJ 08540
john@johnruelaw.com

Date